JOHN DEN on the Demise of HENRIETTA DELAPLAINE, ANN MARIA DELAPLAINE and NICHOLAS DELAPLAINE *v.* EDWARD JONES and SAMUEL SEARING.

IN TRESPASS AND EJECTMENT FOR LANDS IN ESSEX.

*SPECIAL CASE.*

1. N. D. marries M. A. daughter of N. A. and by her has issue, H, A and N., M. A. dies, and N. D. then marries L. A. another daughter of N. D. by whom he has issue, L. N. A., the father then dies leaving children, I. A., P. T., P. C., H. M. and the said L. A., and leaving considerable real estate which descends to his said children. L. A. then dies leaving her said daughter L. living. L. then dies, leaving H., A. and N. her sisters and brother of the half blood, and also, I. A., P. T., P. C. and H. M. her uncles and aunts. H., A. and N. shall inherit the estate of which L. died seized, and not the uncles and aunts I. A., P. T., P. C. and A. M.

2. When lands, tenements or hereditaments, come to the person dying seized by descent, devise or gift from some one of his ancestors, (that is to say from some person from whom lands might by the established canons of descent come to him by descent, in the absence of other and nearer heirs,) then brothers and sisters of the half blood of the person dying seized, who are of the blood of the ancestor from whom the lands, tenements or hereditaments came, shall inherit the lands; but brothers and sisters of the half blood who are not of the blood of such ancestors shall be excluded from the inheritance.

This cause came before the court on the following state of the case agreed on by the parties:

Nicholas Delaplaine, late of Newark, in the county of Essex, took to wife and was lawfully married to Mary Andruss, the daughter of Nathaniel Andruss, and the said Mary had by her said husband issue lawfully begotten, that is to say, three children the lessors of the plaintiff, who are infants; and the said Mary died on or about the thirteenth day of June, in the year of our Lord one thousand eight hundred and thirteen; leaving her said father, husband and children, her surviving. After the death of the said Mary, the said Nicholas Delaplaine took to wife and was lawfully

married on or about the twenty-eighth day of April, in the year of our Lord one thousand eight hundred and seventeen, to Lydia Andruss, another daughter of the said Nathaniel Andruss, and sister of the said Mary Delaplaine, deceased, and the said Lydia by her said husband had issue lawfully begotten, that is to say, one daughter named Lydia Austin Delaplaine. The said Nathaniel Andruss, after the marriage of his said daughter Lydia, as aforesaid, on or about the first day of September, in the year of our Lord one thousand eight hundred and eighteen, departed this life intestate, seized in fee simple of considerable real estate in the county of Essex, leaving Isaac Andruss, Pamelia Todd, Phebe Colt, Henrietta the wife of Jonathan D. Marvin, Lydia Delaplaine and the lessors of the plaintiff, his heirs at law.

After the death of the said Nathaniel Andruss, to wit: on or about the twenty-fifth day of September, in the year of our Lord one thousand eight hundred and twenty, a partition was made of his real estate among his aforesaid heirs at law, and a lot of land with a store house thereon, situate on the north side of Market street in Newark, in the said county of Essex, and a lot of land containing about five acres, lying on the southwest side of the road leading from Newark, aforesaid, to Orange, in the said county of Essex, being the premises in question in this cause, were allotted to the said Lydia, the wife of the said Nicholas Delaplaine, who thereupon became seized thereof in severalty as the law requires, as one of the heirs at law of the said Nathaniel Andruss, and being so seized in the life time of her said husband on or about the fifth day of February, in the year of our Lord one thousand eight hundred and twenty-one, died, leaving her said child, Lydia Austin Delaplaine, her heir at law; who thereupon became seized, as the law requires, of the lands so as aforesaid allotted to her said mother, being the said premises in question, and the said Lydia Austin Delaplaine continued so seized thereof until

on or about the fifteenth day of September, in the year of our Lord one thousand eight hundred and twenty-two, when she died intestate, aged about one year and nine months.

And on or about the twenty-fifth day of February, in the year of our Lord one thousand eight hundred and twenty-one, her father, the said Nicholas Delaplaine, also died.

The lessors of the plaintiff claim title to the premises in question as heirs at law of Lydia Austin Delaplaine, the person last seized and who was their sister of the half blood.

The defendants claim title under Isaac Andruss, the uncle, and Pamelia Todd, Phebe Colt and Henrietta Marvin, the aunts of the said Lydia Austin Delaplaine.

And if upon the whole matter the court are of opinion that the lessors of the plaintiff have title to the premises in question or to any part or share thereof, then judgment is to be given for the plaintiff accordingly; but if upon the whole matter the court are of opinion that the lessors of the plaintiff are not entitled to the said premises or to any part or share thereof, then judgment shall be given for the defendants.

And it is further agreed that either party shall be at liberty to turn this case into a special verdict.

The case was argued at a former term by *Hornblower* and *Vanarsdale*, for the plaintiff, and by *Frelinghuysen* and *R. Stockton*, for the defendants.

The following opinions were delivered by the court :

Ewing, C. J. Lydia Austin Delaplaine was, at her decease in the year 1822, seized in fee simple of the premises in question, which came to her by descent from her mother, Lydia, to whom they came by descent from her father, Nathaniel Andruss. Lydia Austin Delaplaine died under two years of age, and in somewhat more than a year after the death of her mother, and her father, Nicholas

Delaplaine, of the former of whom she was the only child. By the first marriage of her father with Mary Andruss, who was the sister of her mother, and another daughter of her grandfather, Nathaniel Andruss, he had three children, Henrietta Delaplaine, Ann Maria Delaplaine and Nicholas Delaplaine, who are the lessors of the plaintiff, and who insist that the premises in question on the death of Lydia Austin Delaplaine descended to them, and not to Isaac Andruss, Pamelia Todd, Phebe Colt and Henrietta Marvin, who are the real defendants, and who are the brothers and sisters of Mary and Lydia Andruss, the successive wives of Nicholas Delaplaine, the uncle and aunts of Lydia Austin Delaplaine, and the only surviving children of the said Nathaniel Andruss.

On the one hand are the brother and sisters of the half blood of Lydia Austin Delaplaine, by the same father and different mothers, and on the other are her uncle and aunts.

It is agreed that the canon of descent governing the present case is to be found, not in the common law, but in our "act directing the descent of real estates," passed the 29th of January, 1817, *Rev. Laws* 608. Lydia Austin Delaplaine died seized of the premises in question, "without devising the same in due form of law and without leaving lawful issue and without leaving a brother or sister of the whole blood, or any lawful issue of any such brother or sister, and without leaving a father capable of inheriting the said" premises by the said act, and did "leave a brother" and "sisters of the half blood." By the plain words and unquestioned intent of the 5th section of the act aforesaid, the "inheritance," the premises in question did "descend to such brother" and "sisters of the half blood, as tenants in common in equal parts," unless the case is within the proviso annexed to that section and by its influence a different course of descent is required. The proviso is in these words: "Provided always, that in case the said lands, tenements or hereditaments, came to the person so

dying seized, by descent, devise or gift of some one of his or her ancestors, all those who are not of the blood of such ancestor shall be excluded from such inheritance."

The premises in question came to Lydia Austin Delaplaine, "the person so dying seized," "by descent," and of "some one of her ancestors," from her mother Lydia Delaplaine. They are then within the operation of the proviso, and the just construction and effect of this proviso, becomes the subject of careful and anxious examination.

*First*—The proviso does not nor was it intended to form any new, distinct or independent canon or rule of descent. Its sole purpose is to limit and restrain in certain cases the generality of the body of the section. By the body of the section without the proviso, the half blood would in all cases have inherited. Such however was not the design of the legislature. Under certain circumstances it was intended to exclude them from the inheritance; and the purpose of this proviso is to evince this design, and to declare under what circumstances they shall be excluded. This result is proved, 1st. By the general nature of a proviso in a statute; its general object is to qualify, limit or restrain the general enactment which has preceded it. 2dly, By the style and purport of the proviso in question which is manifestly in its style merely exclusive, and in its purport solely framed to limit and restrain what otherwise would have been general. Such being the scope of this proviso, it may not be safely carried farther. Where the person last seized became so, by descent, devise or gift from an ancestor, the proviso simply declares that those who are not of the blood of such ancestor, shall not inherit, leaving those who are of the blood of such ancestor to inherit by force of the general language of the body of the section.

*Secondly*—The person dying last seized is the *propositus* in the cases within the proviso, as well as in those within the body of the section. The ancestor mentioned in the proviso does not in the former cases become the *propositus*.

There is nothing in the language of the proviso to shift the character of *propositus* from the person last seized to the ancestor.

To make the ancestor the *propositus* would totally exclude the half blood, as such, from the inheritance where the lands came to the person last seized by descent, devise or gift from some ancestor. The half blood, as such, could never take. As heirs of the ancestor, if they were such, they might, but as half blood, never. It would be precisely the same thing, as if the statute had declared that the half blood should never inherit where the lands came by descent, devise or gift. Yet, clearly such was not the intention of the legislature. The inheritance is to descend not from the ancestor, but from the person last seized, subject however to this restriction, that in the specified case they are not to take, the descent is not to be cast upon them, unless they are of the blood of the ancestor, but is in all cases to fall on them, and on them exclusively, when they are of such blood.

The consequences which result from making the ancestor the *propositus* and requiring those who take to be his heirs, are such as the legislature did not anticipate or intend, and serve to prove that such is not the principle they designed to establish.

1. The half blood of the person dying seized, though of the blood of the ancestor, will have no preference.

2. A brother or sister of the person dying seized, though born of the same father and of the blood of the ancestor will not be prefered to, but may be compelled to divide with, an uncle or aunt or even a grandchild of an uncle or aunt.

3. If lands are given by an uncle to a nephew, and after they have been greatly improved and enhanced in value by the labors and expenditures of the nephew, the uncle dies leaving a son, and the nephew dies leaving a brother of the half blood by the same father, the son of the uncle must inherit all, and the brother of the nephew nothing.

4. They who take the inheritance, will not be responsible as heirs for the debts of the person dying seized, because they will not take as his heirs, but the heirs of the ancestor; and thus the inheritance will be assets by descent and thereby render the heirs responsible for the debts of a person who was not seized at his decease, but had disposed of the lands, at some perhaps remotely antecedent period.

Again.—To make the ancestor the *propositus* and to seek simply his heir, is to overlook not merely the spirit, but the very letter of the statute. The word " those," in the proviso is a relative term. It respects the half blood previously mentioned, and is the same as if it had been said, all of the half blood who are not of the blood of the ancestor shall be excluded. The obvious spirit of this clause too, is not satisfied by the single quality of heir of the ancestor. The quality of half blood is in view, is indeed the main object of solicitude and cannot be rejected without violation of the design of the Legislature. In the case comprehended in the proviso, two qualities are obviously required, to be of the half blood of him who died seized, and to be of the blood of the ancestor. It is a manifest error to throw off the half blood, as such, entirely, when the inheritance came by descent, devise or gift from an ancestor, and to make the inheritance descend precisely as if it had always belonged to such ancestor, and remained so at the decease of the person last seized.

This construction which makes the ancestor the *propositus* and casts the descent on his heir as such, necessarily requires what ought never, if avoidable, to be conceded, that the Legislature have expressed indirectly and by circumlocution what might readily have been expressed directly and simply, as by the words, " the heir of such ancestor shall inherit," instead of the terms, " all those not of the blood shall be excluded."

Again.—This construction would infringe an ancient and useful rule of the common law. " A man that claimeth as

heir in fee simple to any man by descent must make himself heir to him that was last seized of the actual freehold and inheritance;" *Co. Lit.* 11, *b.* Nothing but the plain and imperious requisition of a statute ought to induce a departure from the well known and safe rules of the common law.

*Thirdly.*—The words "such ancestor" used in the proviso, clearly mean and are exclusively confined to the ancestor from whom the lands came immediately to the person dying seized, and do not embrace other or more remote ancestors, although the lands may have passed from or through such ancestors to the immediate ancestor.

From this examination of the statute, it appears to me to result, that the rule or canon of descent produced by the influence of the proviso on the body of the section, may be thus expressed. When the lands, tenements or hereditaments came to the person dying seized, by descent, devise or gift from some one of his ancestors, that is to say, from some person from whom lands might by the established canons of descent come to him by descent in the absence of other and nearer heirs, then brothers and sisters of the half blood of the person dying seized, who are of the blood of the ancestor from whom the lands, tenements or hereditaments came, shall inherit the lands, but brothers and sisters of the half blood who are not of the blood of such ancestor shall be excluded from the inheritance.

To apply this rule or canon to the present case. The premises in question having come, as already remarked, to Lydia Austin Delaplaine, the person dying seized, by descent from her mother Lydia Delaplaine, the lessors of the plaintiff being the brothers and sisters of the half blood of Lydia Austin Delaplaine, are entitled, if they are of the blood of Lydia Delaplaine, and if not of her blood, are excluded.

One phrase yet remains to be examined and understood, "of the blood." What is meant by being "of the blood" of a person? Who are "of the blood" of an ancestor.

To be of the blood of a person is to be descended from him or from the same common stock or the same couple of ancestors. This definition, it will be observed, includes not only lineals, but collaterals; 2 *Bl. Com.* 202; *ibid.* 202, *note 9; ibid.* 227, *Co. Lit.* 157, *a.* Again.—They are of the blood of an ancestor who with the exception of the father and mother, (whose exclusion in England is peculiar to the laws of that realm, 2 *Bl. Com.* 210, and is founded on feudal principles and policy, *ibid.* 211,) are capable of taking by descent from such ancestor, because the law forbids any from taking by descent, but those who are of the blood of the ancestor. This definition it will be perceived, comprehends not only those on whom under actual circumstances a descent must be cast, as for example, a son on the death of his father, but all on whom under other circumstances the descent may or might be cast, as the grandson who would take if his father were dead, and the uncle who would take at common law on failure of lineal descendants. In short all are of the blood of an ancestor who may in the absence of other and nearer heirs take by descent from that ancestor; 2 *Bl. Com.* 220; *Cruise Dig. tit. Descent, Ch.* 3 *sec.* 45; *Co. Lit.* 12 *a. sec.* 4, *and Coke's Comments; Jenkins* 203. COKE says, *Co. Lit.* 10, *b.* "He that is inheritable is accounted in law next of blood." And again; *ibid* 237, *b.* "By the common law he is only heir who succeedeth by right of blood."

The terms "of the blood" and "heir," are by no means convertible or synonymous, nor does the former naturally or *ex vi termini* mean, next of blood. A grandson during the lifetime of his father is of the blood, yet not heir nor next of blood, of his grandfather. A nephew is of the blood of his uncle, yet not heir nor next of blood, if the uncle have a child or descendant of a child alive. LORD HALE, whose learning and accuracy need no remark, in his history of the common law, 268, says, "It is not necessary that he that inherits be always *heir* to the purchaser, it is sufficient if he be *of his blood,* and heir to him who was last seized."

And if in the consideration of the proviso the quality of half blood be not disregarded, as in my opinion it never should be, then the exposition which would make these terms of the same import might be safely indulged, for if the inheritance be given to the next of blood of the ancestor among the half blood the design of the legislature will be accomplished.

From the meaning of the phrase, "of the blood," thus ascertained, result two clear, safe and unerring *criteria,* whereby the pretensions of the lessors of the plaintiff may be adjudged. They are of the blood of Lydia Delaplaine, who are descended from her or from the same couple of common ancestors. They are of the blood of Lydia Delaplaine, who are capable of taking lands by descent from her. And it remains to be examined whether the lessors of the plaintiff are within both or either of these descriptions.

1. The lessors of the plaintiff are descended from the same couple of common ancestors as Lydia Delaplaine. Like her they are descended from Nathaniel Andruss and his wife. They are the grandchildren of the same man and wife, of whom she is the child. They and she are lineal descendants from the same common stock, *ab eodem stirpite descendentes.*

2. The lessors of the plaintiff are capable of taking by descent from Lydia Delaplaine. 1st. Under our statute. Considering her as a *propositus* or person last seized, and supposing her to have died without leaving lawful issue, it is clear that under the 3d section of our statute, *Rev. Laws* 608, the lessors of the plaintiff would take in common with their uncle and aunts, the share which their mother would have taken if she had survived. 2d. By the common law. If the uncle and aunts did not exist, the male of the three lessors as worthiest of blood, would take as heir of Lydia Delaplaine, and waiving the preference of male, or supposing them all females, they would all succeed to the inheritance. Farther, considering the premises as having descended to

Lydia Delaplaine from her father Nathaniel Andruss, as the fact is, these lessors are capable of taking, for they are of the line from which the inheritance came, *ex parte paterna.* In like manner it may be shewn that those lessors are capable of inheriting from Nathaniel Andruss. In proof of this point however at least so far as the admission of both parties in this cause can sustain it, we need go no farther than the state of the case which expressly sets forth that these lessors were with their uncle and aunts the heirs at law of Nathaniel Andruss.

Thus then it is clearly demonstrated that the lessors of the plaintiff being the brother and sisters of the half blood of Lydia Austin Delaplaine are of the blood of Lydia Delaplaine, the ancestor from whom the premises in question came by descent to Lydia Austin Delaplaine, and on her decease became entitled to them.

The apprehension that the door would be opened illimitably wide, embracing all creation, if the words " of the blood," have, what I claim to be their natural signification, may be readily dispelled. It is no wider than the canon of descent of the common law; 2 *Bl. Com.* 220. " On failure of lineal descendants of the person last seized, the inheritance shall descend to his collateral relations being of the blood of the first purchaser." Now, soaring on the wings of fancy, remembering only that all mankind are descended from the same common parents, with the aid of genealogical tables sufficiently extensive and of a herald who is master of his art, the blood of the first purchaser would have indeed no bounds, but the veins of all mankind. The truth, however, is, that although the number of one's connections is, in no very remote degree, as stated by BLACKSTONE, and shewn by reflection and arithmetic surprisingly great, yet it is almost equally surprising how soon the means of tracing and recognizing them are lost, and the ties of relationship are therefore considered as extinct. Like the wave raised by the falling of the stone on the smooth

surface of the pool, at first distinct and well defined, lessening as it recedes, and soon entirely lost in the surrounding element, from which it can no longer be distinguished.

In the argument of one of the defendants' counsel he put the supposition that instead of an Andruss, Nicholas Delaplaine had married a Pierson, and asked, would not her children have been excluded? I answer, certainly; and for the very reason expressed in the statute, because they would not have been of the blood of Lydia Delaplaine. For the rule deduced from the statute, as I understand it, cuts off all such half blood, and would, in fact, exclude the half blood in the present case, but for the circumstance of the marriage of Nicholas Delaplaine with two sisters, whereby the children of one sister are, as I have shewn, of the blood of the other sister. And when they are within the words and within the spirit and meaning of the law, which was to prevent the lands of an ancestor from going out of the blood of such ancestor, these brother and sisters cannot be excluded because other half blood not partaking of the blood of the ancestor, and, therefore, if admitted to inherit, carrying the estate out of the family, would and ought to be excluded. When these claimants shew us they are within the very terms of the canon of descent, can we send them empty away? They say they are brother and sisters of the half blood of Lydia Austin Delaplaine; and they are so. They tell us they are of the blood of Lydia Delaplaine, the ancestor from whom the premises came; and it is most indubitably true. Can we then answer to them, you shall nevertheless have nothing, because if your father had married a Pierson or a Stiles, her children not being of the blood of Lydia Delaplaine, could have sustained no claim?

Aware that no light can be reflected on the present subject, from the decisions at common law, where half blood is entirely excluded, I have looked with some solicitude, but without much profit, to the laws and reports of our sister states. In all, except Indiana, where the common law in

this respect prevails, provision is made for inheritance by half blood with greater or less degree of favor, and in some the half blood are placed on equal ground with the whole blood. But I have not found any reported decision which can aid us in our present enquiry.

As little information will be gained by a recurrence to the civil law; for in that code, where the half blood is not excluded, but postponed to the whole, no rule exists to limit the descent of the inheritance to the blood of the first purchaser, nor is any consideration had, whether the estate first came by father's or mother's side; 1 *Bro. Civ. Law* 223.

It was said by one of the defendants' counsel, that the course of succession to real estate, is the creature of positive law, and there, and not in feeling or imagination, is the judge to seek the light of truth. The remark was just. The path of the judge, is the narrow, painful way of deep responsibility, and anxious solicitude, and incessant watchfulness; and he most assuredly wanders when he is driven by fear, allured by affection, enticed by commiseration or overcome by sensibility. But the duty of the judge performed—the law ascertained and pronounced—he may then safely look back and rejoice that the law and its interpretation conform to the dictates of humanity and the warm feelings of the heart. Nor is authority wanting. The Court of King's Bench long since said; 2 *Mod.* 206, " Such construction should be made of the statute, as would be most agreeable to the will of the dead person, if he had devised his estate by will, and it was not to be imagined if such will had been made, but something would have been given to the children of the half blood.

ROSSELL, J. concurred with the CHIEF JUSTICE.

FORD, J. Lydia Austin Delaplaine, an infant of tender years, and owner of certain lands in fee simple, which she inherited by descent from her mother, died seized thereof,

" without devising the same in due form of law, and without leaving lawful issue, and without leaving a brother or sister of the whole blood, or lawful issue of any such brother or sister, and without leaving a father capable of inheriting the estate." Whereupon two classes of kindred are claiming the inheritance; each class insisting on the exclusion of the other.

The plaintiffs who compose one of these classes, shew themselves to be brother and sisters of the half blood to the intestate, by a common *father* but different mothers. They shew themselves to be also first cousins of the intestate by being the descendants of two *sisters;* their common father Delaplaine having married *Mary Andruss* for his first wife, by whom he had the plaintiffs; and after the death of Mary Andruss, having married her sister *Lydia Andruss,* by whom he had the intestate.

The other class of kindred are brother and sisters of the whole blood to Lydia Andruss the mother, who is the *ancestor* from whom the estate came to the intestate *by descent.*

The dispute between these kindred arises upon the legal construction of the 5th section of the general act, entitled " An act directing the descent of real estate," *Rev. Laws* 609; the substance of which section, so far as concerns this dispute, is in the following words : " That when any person shall die seized of any lands in fee simple, without devising the same in due form of law, and without leaving lawful issue, and without leaving a brother or sister of the whole blood, and without leaving a father capable of inheriting the said lands, and shall leave a brother or sister of the half blood, the inheritance shall descend to such brother and sister of the half blood as tenants in common in equal parts; *Provided always,* that in case the said lands came to the person so dying seized by *descent, devise* or *gift* of some one of his or her *ancestors,* all *those* who are not *of* the blood of such ancestor shall be excluded from such inheritance."

It will be admitted that according to the plain language of this section, all estates in land are not to descend by the same rule; one great class and by far the greatest, consists of those estates which the intestate may have acquired by *his or her own industry*, and all these will descend to half blood; but there is a small class of estates designated in the proviso, such as the intestates acquired by *descent, devise or gift from an ancestor*, which are to descend to none who are not *of* the blood of such ancestor; they evidently consist of such estates for which the intestate never paid any consideration; they came from an ancestor who took no pay for the property, but disposed of it as a token of special bounty *to his own blood*. Now the half blood *as such* could not be allowed to take estates appropriated without consideration to such blood, without turning the ancestor's bounty out of the blood in which it was intended; for one truth will stand out for ever as big as a mountain, that the admission of *half blood as such* will carry estates away from the *whole* blood of such an ancestor. Therefore the legislature with distinguished magnanimity, have referred such estates back to the blood of the ancestor from whom they so generously came, and for the benefit of whose blood they were evidently left and intended. While the 5th section directs therefore as a general rule, that real estates may descend to half blood, it takes care to make an exception of these three kinds of estates that are *not* to descend according to the general rule; and it is plain that these, as being excepted cases, would have been under the government of *no* rule, if one had not been provided for them *in this proviso*. That an important rule should be placed in a proviso will not appear unusual in legislation. The supposition that after a proviso has excepted certain cases it has discharged its *whole office*, and cannot lawfully go further, nor express the will of the legislature how those excepted cases shall be governed, is at variance with almost every page in the statute book. The examples that overthrow such a supposition are

28

almost innumerable. For brevity sake, I shall state only one, which is to be found in the act for establishing useful manufactures at Paterson, *Rev. Laws* 109. The 4th section exempts the lands of that corporate body from taxation; then follows *a proviso* that such exemption shall continue in force for only ten years; the proviso then goes on, and prescribes a rule, according to which, after that time, the corporate lands shall be assessed, and in no other manner. An act is hardly to be found of any considerable length in the book, which does not contain a proviso, that after limiting and excepting certain cases, does not go on to prescribe the rule by which those exceptions shall be governed; *see Rev. Laws,* 14, *sec.* 4, 5, 6—17, *sec.* 10—34, *sec.* 4, 5—45, *sec.* 24—49, *sec.* 35—51, *sec.* 6—55, *sec.* 1—67, *sec.* 10, &c., &c., beside a notable example in the 3d section of the constitution of the state.

A most important rule or canon touching estates that come, in such case, by *descent, devise* or *gift* of an ancestor, is, therefore, laid down by the legislature in this proviso, in the following words: "*all those who are not of the blood of such ancestor shall be excluded from the inheritance.*" The manifest and necessary consequence of *excluding* all those who are *not* of that blood, is a limitation of the inheritance to those who *are* of the blood. It expresses the rule in negative words, declaring to whom the estate shall *not* descend; but it is manifestly introductory of an *affirmative* rule, that it *shall* descend to the blood of the ancestor from whom it came. Such ancestor may be a collateral and very remote relative of the person last seized, even in cases of *descent,* and much more so in cases of *devise* or *gift.* Now it is in the blood of *such ancestor,* however remote, that the estate is to rest, without the smallest reference to the *blood of the person last seized.* The policy of the section is plainly this, when the *whole blood* in a particular line becomes extinct, estates acquired by industry shall descend to half blood; but estates acquired by *descent, devise* or *gift*

from an ancestor, shall be remitted back to the blood from which they last came, in order to follow a legal direction in that line.

An undue stress was laid therefore in the argument of the cause, upon the relationship of the plaintiffs to the person last seized. It was altogether misplaced and useless. Relationship to the person last seized avails nothing. It is not *that* person, but his or her *ancestor* to whose blood the inheritance is directed. The plaintiffs, therefore, *cannot*, and as I understood their argument did not, claim on the ground of being half blood brother and sisters to the person last seized ; but they rested their claim where alone it can rest under this proviso, on their being *of* the blood of Lydia Andruss, *the ancestor* from whom the estate descended. That they are so, cannot admit of a doubt. Though not her children, they are the children of Lydia's sister, and the two sisters were children of Nathaniel Andruss ; consequently his direct blood has flowed down into all their veins. Many authorities were cited to shew what certainly admits of no dispute, that a father is *of* the blood of a son, and a brother *of* the blood of a brother. It must be equally true that *nieces* are *of* the blood of an *aunt*. They are not indeed *her blood*, but they are *of* or *from* the same fountain of blood, because in the second degree upward their line and their aunt's line come into one and the same person, that is Nathaniel Andruss, who was their common ancestor, which is the very definition of collateral consanguinity.

There was some diversity of statement about who is properly in this case the *propositus* or person from whom the inheritance in question is to be derived ; some arguments appearing to assume Nathaniel Andruss to be such, some Lydia Andruss, and some the person last seized. At common law a person must make himself heir of the person last seized, according to the maxim that *seisina facit stipitem*. But an act of the legislature has plenary power to alter this or any other rule of common law, and I conceive the pro-

viso in this act has altered that rule in this special case; for it limits the inheritance to those who are of the blood of Lydia, the ancestor, and thereby of necessity constitutes *her* the *propositus* or stock from whom the inheritance must be considered as descending. Though the person last seized in this case was a Delaplaine, the proviso shuts out that blood, and refers back for the heir to a very different blood, namely, to that of *Lydia Andruss,* from whom the estate descended; and of necessity *she* must be the *propositus* as the heir is to be of her blood. Now on the death of the infant, the *lineal* descendants or issue of Lydia Andruss became extinct, so that an heir of her blood can be found only among her *collateral* kindred. Of these the case mentions *her brother and sisters* on one hand, and on the other *her nieces,* beside whom there may be a vast number of collateral kindred in *remote degrees* whom the case does not bring into view; as the difficulty lies not in finding persons of her blood, but in making a proper selection from among them. Now a safe, certain and universal rule for selecting the heir or heirs of an ancestor is provided for in the *order of succession* or proximity directed by the legislature in the act concerning the descent of lands; the order is first to the *issue ;* if there be none, secondly to *brothers and sisters ;* if there be none, thirdly to the *father;* if there be none, fourthly to *brothers and sisters of the half blood ;* in which order the legislature place brothers and sisters of the *whole blood,* plainly before brothers and sisters of the *half blood.* No plainer rule can be found for directing us to an heir *of the blood of Lydia Andruss,* if that be what we seek for.

It is objected, however, that we are not to seek for *Lydia's* heir, but for an heir to the deceased *infant.* On this point we must follow the directions of the proviso. The estate came to the infant without money, and without price, by descent from the *mother,* and now that the infant is dead without issue or brother or sister of the whole blood, the proviso directs the estate to go back *to the blood of the*

*infant's mother*; consequently an heir must be found *in the mother's blood;* for the proviso declares that none but those who are of the blood of the mother shall succeed to the inheritance.    To say that the heir shall be a person *of her blood,* and yet that she shall not be the *propositus* or stock in whose blood an heir is to be sought for, involves a contradiction.    The proviso does not contain such a word as, *" blood of the person last seized,"* nor are *brothers or sisters of the half blood named in it.*    I could as freely make a new proviso, as insert in the present one those essential alterations.    They are the words of the legislature, and are to be understood according to their true meaning, but without the liberty of making unauthorized additions or alterations.    If those are to be excluded who are not of the blood of the ancestor, it necessarily forces us back to that ancestor to look for an heir.    There is no difference between the heir of an ancestor, and an heir of the blood of an ancestor; they mean the same thing; and unless the court come to this conclusion they cannot execute the proviso in a great multitude of cases.   The present case of a man marrying two sisters forms an anomaly; the issue of *such* a marriage, disposed of in *such* a form, may not occur again in a century.    In all cases but such as this, the court will be compelled to adjudge the inheritance under this proviso to those who are *next* of blood to the *ancestor.*    These half blood relatives of the deceased infant, happen in this singular case, to be remotely of the blood of Lydia Andruss, the ancestor; but let us suppose, as it is quite lawful to do, for illustration, that they had *none* of her blood, and did not ask for the inheritance; a most important and decisive question then arises, *how* the estate shall descend?    It cannot descend under the 3d section of the statute, because the infant and not the ancestor, was the last owner; and beside, if the estate had come by *devise* or *gift* from the ancestor, she would not have died seized of the estate without disposing of it; for these reasons it could not come under the words or provisions of the 3rd section; but

it would come under the government of this proviso, and no other law, it being an estate by descent from an ancestor, to a person who had died without issue or brother or sister of the whole blood, or father, *leaving a brother and sisters of the half blood ; in which case* the proviso is peremptory that the estate shall go only to those who are of the blood of the ancestor Lydia Andruss ; and according to our *supposition* the half blood relatives of the infant are not of it. The decisive question is, how shall the estate descend to Lydia's blood, unless we understand by it *next* of blood ? I trust no person will hazard an opinion that it shall descend to *all her blood in mass, the remote as well as the near ;* for let it be supposed that since the settlement of this country there have been *five* generations, of six each, in the Andruss family, and then it can be demonstrated that there are *now living* between six and seven thousand person, under divers names, *who have some of her blood ;* and a construction that it shall descend to *all* of her kindred in mass, is too absurd, whimsical and ridiculous to be adopted by any body.

The only alternative that remains is, to construe "of the blood," to mean *next of the blood in equal degree.* Though *next* is not a word in the proviso, as I fully admit, it is *implied* in the strongest manner and by the most necessary consequences. If it were not for that implied word which contains in it the great principle of proximity in blood, this estate (the half blood being excluded by our supposition) might as well go to Lydia's third or fourth cousins, whom she never heard of, nor they of her, as to *her own brother and sister.* If there were *no* consanguinity between the half blood and ancestor, the court do no otherwise than adjudge that the words " of the blood " mean *next* of blood. But to say that the proviso *shall* mean *next* when the half blood have no consanguinity, and *shall not* mean next when they have, is working a contradiction in the same words; that is, to mean next and not next according to circumstances. If they mean *next* it follows that the brothers and

sisters shall stand before the *nieces;* if they do not mean next it cannot be determined who shall have the estate where the half blood have no consanguinity with the ancestor.

The plaintiffs insist that instead of being *next* of blood, it is sufficient if they have *any* of the blood, to entitle them to the estate. Now let us suppose, (since estates by descent, devise and gift stand on the same footing) that this estate had come from Lydia Andruss by *gift or devise* and that a daughter of her's by a prior marriage was *now living;* could this *daughter*, Lydia's own child, be cast out of the inheritance to make room for Lydia's *nieces?* Yet such would be the unnatural consequence of construing the proviso to mean *any* instead of *next.* Or suppose the estate had come by gift or devise from Nathaniel Andruss and was to return *to those of his blood*, could *his own son now living*, who is first and nearest of his blood, be pushed aside by these *remote relations?* Could the Legislature have ever intended this outrage on their own rule of *proximity* in families? Yet such would be the consequence of the construction contended for. If the *nieces* are *of* the blood of Lydia, so assuredly are her *brothers and sisters*, and with the advantage of being one degree nearer, inasmuch as they are related to her in the *first* degree, and the nieces only in the *second.*

If being *of* the blood, means that having *any* of the blood, however small, shall entitle the half blood before relations *nearer* in degree, the half blood may usurp the estate in all cases whatever; they need never fail to make it out that they have *some* of *any* person's blood. The word *any* opens a wider scope than the mind at first view is ready to perceive. *Justice Blackstone*, founding his assertion on holy writ, says, that all the people of the earth are *of* one blood, being all descended from Adam, and later still from Noah; consequently the half blood would never fail of shewing themselves, remotely, *of* the blood of *any* person; and if the word *next* be not implied the proviso forms no check whatever.

If it be answered that the half blood must not look so far back as Adam or Noah, it is all I want, for then *some restriction* is admitted to be *implied,* and the only dispute will be what that restriction is. I contend for the restriction of *proximity* in blood as established by the legislature in the act concerning descents; such is a *legal* restriction, and will make the proviso yield us a sensible and practicable rule. If we depart from proximity as established by them, and resort to fancy for a restriction, shall it be fixed at the fourth, fifth or sixth degree? Or may · the half blood go back to the *tenth,* which, according to *Justice Blackstone,* will comprise upwards of two hundred and fifty thousand relatives, and being of the blood of any *one* in that vast number is to be of the blood of the *ancestor.*

· If it be said that the half blood must *name* the person who was a common ancestor to them and to the donor or devisor of the estate, I say that it is not ·difficult by the assistance of a liberal collection of records, touching marriages, births and deaths, for the half blood to shew that they have *some,* a remote drop of *any* man's blood in their veins. It was said by some one, I think *Marmontel,* that when the French King's mistress, a beautiful woman who came to Paris an utter stránger, was advanced to 'her unenviable distinction, that *any* person, wishing to obtain her influence at court, could, with the assistance of the herald's books and their record of pedigrees, make himself out to be *remotely allied to her in blood;* he was her fifth, or sixth, or seventh, or eighth cousin. This, which at first sight resembles exaggeration or burlesque, may nevertheless be entirely true. By a grave note appended to page 206 in *Christian's Blackstone,* it appears that if marriage among *remote* relations were not allowed of in England, it would be necessary for an Englishman in quest of a wife to go *out* of the *kingdom.* In short, if a person's being of the blood without *proximity* were holden to be sufficient, the proviso might as well be repealed. The legislature never could

have intended that the *thousandth* part of a drop of the ancestor's blood in a comparative stranger, should be sufficient to set aside the nearest relations. It is not consanguinity generally, but the degree of it, that entitles heirs to succeed to an ancestor; those nearer in degree are never extruded to make way for those who are more remote. It is a fixed principle of succession at common law that an heir shall be the *next* of blood; amidst the great changes that our legislature have made in the laws of descent, they have never departed from that essential principle. In every other section of the statute respecting descents the rule of *proximity* is strictly observed; in no instance is the *second* degree put before the *first*. Could it be their intent in this solitary instance, by placing the *second* degree *first*, and the *remote* before the *near*, to disturb the great principle of *proximity* in families, merely for the pleasure of an anomaly? It cannot be. In directing the inheritance back to the blood of Lydia Andruss, the proviso means that those *nearest* to her in blood, shall be preferred to those who are more remote. This rule beside its analogy to every thing in the act is also simple and will prevent all future disputes. The nearest relations of this ancestor are her brother and sisters; they stand one degree nearer than her *nieces*.

I am therefore of opinion that under this proviso the estate will descend to the brother and sisters of Lydia Andruss as tenants in common, to each one an undivided sixth part; and that the lessors of the plaintiff will take among them only that share or sixth part which would have vested in their mother *Mary,* as one of those sisters, had she been living.

Judgment for plaintiff.